## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| MARK W. EVES, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Docket no. 1:15-cv-300-GZS |
| | ) | |
| PAUL R. LEPAGE, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON DEFENDANT'S MOTION TO DISMISS

Before the Court is Defendant's Motion to Dismiss (ECF No. 9).  The Court previously granted the parties' Joint Motion for Oral Argument (ECF No. 21) and held oral argument on April 13, 2016.  Immediately prior to oral argument, the Court granted without objection Plaintiff's Motion for Leave to File Second Amended Complaint (ECF No. 33), thereby making the Second Amended Complaint (ECF No. 38) the operative pleading for purposes of the pending Motion to Dismiss.  (See 4/13/16 Proc. Order & Report of Conf. (ECF No. 36).)  Having fully considered the written and oral submissions of counsel, the Court now GRANTS the Motion to Dismiss.

## I.  LEGAL STANDARD

The Federal Rules of Civil Procedure require only that a complaint contain "a short and plain statement of the grounds for the court's jurisdiction . . . a short and plain statement of the claim showing that the pleader is entitled to relief; and a demand for the relief sought[.]"  Fed. R. Civ. P. 8(a)(1)-(3).  In deciding a motion seeking dismissal for failure to state a claim, the Court assumes the truth of the complaint's well-pleaded facts and draws all reasonable inferences in

plaintiff's favor.  Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). The Court may "supplement [the complaint's] factual allegations by examining 'documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice.'" Butler v. Balolia, 736 F.3d 609, 611 (1st Cir. 2013) (quoting Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)).

A viable complaint need not proffer "heightened fact pleading of specifics," but in order to survive a motion to dismiss it must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In considering a motion to dismiss, the Court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  A plaintiff must include enough facts supporting a claim for relief that "nudge[s] [the] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.  "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quoting SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010)); see also Iqbal, 556 U.S. at 678 (stating that the Court need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements").  However, "[T]he court may not disregard properly pled factual allegations," even if the allegations are "improbable" or the chance of "a recovery is very remote and unlikely." Ocasio–Hernández v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011).

II.     **PROCEDURAL HISTORY AND FACTUAL ALLEGATIONS**[1]

In accordance with the motion to dismiss standard and recognizing that there has been no discovery, the Court makes no factual findings at this stage of the proceeding and draws the following recitation from the allegations found in the Second Amended Complaint (ECF No. 38):

The Maine State Legislature convenes for a biennium that is divided into two sessions. Members of the Maine State Legislature are paid a set salary for this two-year term.  See 2 M.R.S.A. § 2.  Currently, the salary totals $24,056, with $14,074 paid during the first regular session and $9,982 paid during the second regular session.  When the Legislature is in session, legislators also currently receive a $38 per diem for housing or mileage and tolls.  The first session generally convenes in December and, by statute, defaults to adjourning on the third Wednesday in June.  See id.  The second session generally convenes the following January and, by statute, defaults to adjourning no later than the third Wednesday in April.  See id.  Given this salary level and schedule, most members of the Maine Legislature maintain additional jobs or income streams to support themselves.

Plaintiff Mark W. Eves, a Democrat, is an elected member of the Maine House of Representatives representing a district that includes his residence in North Berwick, Maine.  Eves is serving his fourth term and, thus, is ineligible to be re-elected to his current seat once his present term ends in December 2016.[2]  Eves first successfully ran for state representative in 2008.  He was

---

[1] In addition to the factual allegations laid out in Plaintiff's Second Amended Complaint, there are certain actions taken by the Governor and the Maine Legislature in the relevant timeframe that are essential to issues now before the Court.  Therefore, the Court's factual recitation also includes certain facts that are capable of being judicially noticed.  All such facts are followed by citations to the statutes or other publicly available records relied on by the Court.

[2] See 21-A M.R.S.A. § 553(2) ("A person may not serve more than 4 consecutive terms as a member of the state House of Representatives."); see also 3 M.R.S.A. § 41-A (setting a term limit for the Speaker of Maine's House of Representatives of "3 consecutive legislative bienniums").  The Court notes that these various term limit statutes would not prevent Eves from seeking another state elected office.

first elected Speaker of Maine's House of Representatives in 2012 and re-elected as Speaker in 2014.  As Speaker, Eves is responsible for the operating budget and management of the House of Representatives and the non-partisan offices including the Office of the Executive Director, the Office of Fiscal and Policy Review, the Office of Information Technology, the Office of Policy and Legal Analysis, and the Office of Program Evaluation and Government Accountability.

In addition to serving in the Maine Legislature, Eves is a trained marriage and family therapist with fifteen years of work experience in the field of behavioral health and family therapy, including experience in community health organizations and running his own clinical private practice.  Upon moving from California to Maine in 2003, he worked as a Program Director and Family Therapist for Odyssey Children's Therapeutic Center in Sanford, Maine.  Beginning in 2004, he began working for Sweetser in various positions.  From about 2010 to 2013, Eves was the Director of Business Development for Sweetser; a position in which he reported directly to Sweetser's Chief Executive Officer.  Eves also served as President of the Maine Association for Marriage and Family Therapy from 2006 to 2008.

Good Will-Hinckley ("GWH") is a private, not-for-profit organization focused on serving at-risk and non-traditional youth from across Maine.  Located in Fairfield, Maine, it offers educational, counseling and social service programs to help at-risk youth.  Originally opened as a farm, school and home for needy boys in 1889, GWH has operated on donations and governmental grants for most of its existence.  Currently, GWH operates several other institutions on its campus, including a college step-up program, in partnership with Kennebec Valley Community College, the Glen Stratton Learning Center for youth with emotional and behavioral challenges, a nutrition program, the Carnegie Library and the LC Bates Museum.

Via legislation passed in 2009, the State of Maine established "the Center of Excellence for At-risk Students" and designated GWH "to serve as the nonprofit charitable corporation with a public purpose to implement the Center of Excellence for At-risk Students." 2009 Maine Session Laws Ch. 296 (codified in relevant part at 20-A M.R.S.A. §§ 6951-6954). Following this designation, GWH opened a charter school, called the Maine Academy of Natural Sciences ("MeANS") in September 2012. MeANS has its own board of directors and its own principal. MeANS receives discretionary state funding pursuant to its designation as "the Center for Excellence for At-risk Students." See 20-A M.R.S.A. § 15689-A(20) ("The commissioner may expend and disburse funds for the Center of Excellence for At-risk Students in accordance with the provisions of chapter 227."). (See Def.'s Mot. at 5 n. 2.) For the two-year state budget covering July 1, 2013 through June 30, 2015, this discretionary funding totaled $1,060,000, which was paid to GWH.[3] GWH relied on this discretionary state funding to pay for salary, wages, benefits, and other operational expenses such as food, transportation, and utilities.

In September 2014, the then-president of GWH, Glenn A. Cummings, resigned after serving in the position for about four years. Cummings had been Speaker of the Maine House of Representatives from December 2006 until December 2008.[4] Although Cummings opposed charter schools while serving in the Maine Legislature, he oversaw the start of a charter school during his tenure at GWH and state funding for GWH was strongly supported by Governor LePage. After President Cummings resigned, GWH conducted a nationwide search for a successor. This search was led by its Interim President, Richard A. Abramson, who headed up a six-person

---

[3] As of June 5, 2015, GWH had received the entirety of this discretionary funding from the 2013-2015 budget via eight equal installment payments made at the beginning of every quarter of the fiscal year.

[4] Cummings, a Democrat, served as the Speaker of the Maine House of Representatives during the 123rd Legislature. See https://legislature.maine.gov/house/history/leaders htm (last visited April 28, 2016).

President Search Committee.  The Search Committee received nineteen applications for review. Ultimately, the Committee identified six candidates to be interviewed.  Among those six candidates was Eves, who had submitted a letter of application and resume for the President position on March 8, 2015.  The six candidates selected for interviews by the Search Committee were each asked to then submit three current letters of reference.[5]

On April 24, 2015, Eves participated in a telephone interview with the Search Committee.[6] After these six initial interviews, the Search Committee met and narrowed the top candidates to three, including Eves. On April 29th and 30th, these three remaining candidates visited GWH's campus, where they met selected parents and staff, and met with the GWH Senior Leadership Team for an interview.  The Senior Leadership Team consisted of the Vice President of Operations, the Director of Finance, the Principal of MeANS, the Director of IT, the Director of Curriculum/Assessment, the Director of Admissions, and the LC Bates Museum Curator.  All three candidates were asked the same questions.

On April 30, 2015, the GWH Senior Leadership Team provided the Search Committee with a memo detailing their evaluation of the three remaining candidates and their unanimous conclusion that "after much discussion about all three candidates, among your senior leaders, the individuals who have boots on the ground and will be working extensively with the President, it is our wish to put forth only one candidate for recommendation, and that candidate is MARK EVES." (Second Am. Compl. ¶ 63.)  Their memo cited his "extensive clinical experience," his "balance of executive administration and fundraising experience," and his "leadership style and polished

---

[5] Eves' submission included a letter of support from the CEO he worked for at Sweetser, Carl Pendleton. Pendleton confirmed his strong belief that Eves was highly qualified for the position.  He confirmed that Eves was very successful in his business development position growing Sweetser's business, including great success in growing partnerships with hospitals, physicians, and community organizations across the state.

[6] Before it began interviewing candidates, the Search Committee expanded to eight members.

approach" as reasons the seven-person Leadership Team supported Eves over the other two finalists.  (Id.)

Ultimately, by May 5, 2015, two finalists, including Eves, were scheduled for May 15, 2015 interviews with the full boards of GWH and MeANS.  On May 13, 2015, Eves and the other finalist each had an informal meeting with GWH Board Chair John P. Moore and two members of the Search Committee.  After the May 15th interviews, the full boards of GWH and MeANS unanimously voted to offer Eves the President position.  On June 5, 2015, Eves signed a two-year employment agreement with GWH.  The agreement had a for-cause termination provision and no conditions or contingencies regarding (1) any form of actions or approvals by the State or (2) the receipt of funds from the State.  Eves' selection as the next President was announced by the GWH Board of Directors on June 9, 2015.  The Board statement detailing Eves' selection touted his experience as a "behavioral counselor dealing with at-risk children and families, his clinical and administrative experience in the field of behavioral health, 'as well as his statewide policy and leadership experience as Speaker of the Maine House of Representatives.'"  (Second Am. Compl. ¶ 70.)

Defendant Paul R. LePage, a Republican, is the elected Governor of the State of Maine.  In the Spring of 2015, the Governor and the Maine Legislature were attempting to complete the work of the first regular session of the 127th Maine Legislature, including the State's biennial budget for the two-year period beginning on July 1, 2015.  As the legislative debates escalated in the waning days of the session, on May 29, 2015, Governor LePage held a press conference during which he stated that he would veto every bill sponsored by a Democrat for the rest of the time he is in office unless the Legislature agreed to support his plan to have a referendum vote on eliminating Maine's income tax.  At the same press conference, Governor LePage stated:

"Frankly, I think the Speaker of the House should go back home where he was born."  (Second Am. Compl. ¶ 74.)

On the morning of June 5, 2015, Governor LePage learned that Speaker Eves had been selected by GWH to be its new President.  That same day, LePage telephoned Richard Abramson, then the Interim President of GWH.  LePage told Abramson that he was extremely upset to learn about the hiring of Eves as the new President.  LePage used profanity to describe the Speaker and his work.  During the call, Abramson attempted to explain the search process that culminated in Eves' selection.  On or soon after June 5, 2015, LePage also sent a handwritten note directly to the GWH Board Chair.  This note referred very negatively to Eves, including the statement that he was a "hack."  (Second Am. Compl. ¶ 98.)  The Board Chair understood upon reading this note that GWH would lose $1,060,000 in state funding if it retained Eves as its new President.  In fact, the not-yet-enacted state budget called for discretionary funding totaling $1,060,000 ($530,000 per year for the next two years).

On the following Monday, June 8, 2015,  LePage sent a public letter to the Board Chairs of GWH and MeANS urging that they reconsider the decision to hire Eves as the new President of their organization.  In this letter, he described Eves as "a longtime opponent of public charter schools" and complained that Eves "fights every effort to reform Maine's government."  (Second Am. Compl. ¶ 101.)  After considering this letter, the GWH Board, which includes people of various political affiliations, agreed that their selection of Eves was well-supported and was not based on political considerations.

On June 8, 2015, LePage also received a call from Gregory W. Powell, the Chairman of the Board of Trustees of the Harold Alfond Foundation, in response to a voicemail LePage had

left Powell.[7]   In the conversation that followed, LePage explained to Powell that he was withdrawing all support, including financial support, from GWH as long as Eves remained as President of the organization.  After the call, Powell researched exactly how much funding the state would be withdrawing.  Then, on June 18, 2015, Powell sent a letter to the Chair of the GWH Board indicating GWH was facing "a likely loss of $1,060,000 in state funding over the next two years for the residential programming" and expressing "a serious concern of the Harold Alfond Foundation regarding the future financial viability" of GWH "given the likely state funding loss" and "by extension its ability to achieve the goals" required for it to receive its $2,750,000 future grant from the Foundation.

Additionally, on June 8, 2015, LePage vetoed ten bills that were sponsored by Democrats.  In doing so, LePage explained:  "As promised, I am vetoing all bills sponsored by Democrats because they have stifled the voice of Maine citizens by preventing them from voting on the elimination of the income tax." (Second Am. Compl. ¶ 76.)

On or about June 9, 2015, Governor LePage told his Acting Commissioner of the Maine Department of Education (the "DOE"), Tom Desjardins, and his Senior Policy Advisor, Aaron Chadbourne, that he would not send any more funding to GWH that was not required by law.  In response to LePage's pronouncement, Acting Commissioner Desjardins intervened to stop an installment payment check of $132,500 in discretionary funds to GWH that, consistent with prior practice, had already been submitted by the DOE to the Office of the State Controller for payment to GWH in the upcoming quarter beginning on July 1, 2015.[8]

---

[7] LePage left Powell a voicemail on June 5, 2015 as part of his initial round of communications after he first learned of Eves' new role at GWH.  In reaching out to Powell, LePage knew that the loss of $1,060,000 in discretionary state funding would in turn jeopardize the $2,750,000 in GWH funding slated to come from the Harold Alfond Foundation.

[8] As of June 9, 2015, the State budget for the fiscal year commencing July 1, 2015 had not yet been enacted.  So, this payment was contingent on the enactment of the State's budget.

On June 22, 2015, Eves' lawyer communicated with LePage's Chief Counsel and requested that LePage withdraw his threat against GWH to withhold budgeted discretionary funding unless it fired Eves because that threat violated Eves' clearly established First Amendment rights. Eves' counsel provided LePage's Chief Counsel with copies of two cases upholding similar claims against Governors, including a decision of the United States Court of Appeals for the First Circuit.[9] On June 23, 2015, LePage's Chief Counsel reported to Eves' lawyer that the Governor would not withdraw his threat regarding the GWH funding. However, through June 23, 2015, LePage also did not take any steps to reduce or eliminate the $1,060,000 in discretionary funds allotted in the proposed state budget for GWH.

GWH fired Eves on June 24, 2015. Eves publicly reported that his firing was caused by LePage's threat to withhold funding. In the days that followed his firing, Eves received emails from three members of the GWH Senior Leadership Team expressing their support for his qualifications and selection as well as an email from former Interim President Richard Abramson stating that he believed Eves "would have been a wonderful fit for Hinckley." (Second Am. Compl. ¶¶ 107 & 108.)

In response to media coverage of Eves' firing, on or about June 25, 2015, Maine State Senate President Mike Thibodeau, a Republican, issued a public statement reading in part: "I am very saddened by this situation and shocked by what is being alleged. Nearly all legislators depend on a career outside of the State House to provide for their families." (Second Am. Compl. ¶ 112.) Similarly, Maine State Senator Roger Katz, a Republican, stated publicly: "I just don't think there is any question that Mark Eves is qualified to lead GWH. This really goes beyond the political.

---

[9] The cases provided were: <u>Mihos v. Swift</u>, 358 F.3d 91 (1st Cir. 2004) and <u>Blankenship v. Manchin</u>, 471 F.3d 523 (4th Cir. 2006). (Second Am. Compl. ¶ 104.)

This is personal and vindictive.  I often disagree with Speaker Eves, but he's a fine and honest man.  More importantly, he's a husband and a father of three beautiful kids who is trying to support his family.  Political battles are one thing, but trying to ruin someone economically is quite another."  (Second Am. Compl. ¶ 113.)

After initially refusing to confirm or deny any role in the GWH decision to dismiss Eves, on June 29, 2015,  LePage was asked directly by a reporter whether he "threatened to withhold money" from GWH because of its hiring of Speaker Eves. LePage responded, "Yeah, I did!  If I could, I would!  Absolutely; why wouldn't I?  Tell me why I wouldn't take the taxpayer money, to prevent somebody to go into a school and destroy it.  Because his heart's not into doing the right thing for Maine people."  (Second Am. Compl. ¶ 114.)

In his July 7, 2015 radio address, LePage again admitted that he made the financial threat against GWH to get Eves fired because of Eves' public statements and other political activities opposing charter schools: "He [Eves] worked his entire political career to oppose and threaten charter schools in Maine.  He is the mouthpiece for the Maine Education Association.  Giving taxpayers' money to a person who has fought so hard against charter schools would be unconscionable."  (Second Am. Compl. ¶ 122.)  In that same July 7th radio address, LePage accused Eves of misconduct: "Former legislator Paul Violette, the past head of the Maine Turnpike Authority, went to jail for enriching himself and misappropriating public money. . . . These former legislators used their political positions to land cushy, high-paying jobs in which they were trusted to use taxpayer money to improve the lives of Mainers.  They abused that trust and had to face the consequences of their actions.  The same is true of Mark Eves."  (Second Am. Compl. ¶ 121.)  On July 30, 2015, during a radio interview, LePage incorrectly stated that Eves submitted his application for the GWH job "and seven days later after a national search he was awarded the job."

(Second Am. Compl. ¶ 124.)  Also, during a July 30th radio interview responding to questions about why he intervened in GWH's hiring of Eves, LePage said:  "[Eves] is a plant by the unions to destroy charter schools. . . . I believe that is what his motive is. . . . That man had no heart." (Second Am. Compl. ¶ 13.)  LePage then analogized his decision to pull funding from GWH to "one time I stepped in . . . when a man was beating his wife" and stated, "Should I have stepped in?  Legally, no.  But I did.  And I'm not embarrassed about doing it."  (Id.)

The default statutory adjournment date for the first session of the 127th Maine Legislature was June 17, 2015.[10]  However, the session was extended multiple times and the first session did not finally adjourn until July 16, 2015.  See Opinion of the Justices, 123 A.3d 494, 501-03 (Me. 2015).  One of the final issues to be resolved in the first session was passage of the state's biennial budget (L.D. 1019) for the fiscal period beginning on July 1, 2015.  As amended, L.D. 1019 was passed by both the Maine House of Representatives and Senate on June 17, 2015.  As allowed by Maine statute, the Governor then exercised his right to issue line-item vetoes of particular appropriation amounts.  See Me. Const. art. IV, pt. 3, § 2-A.  All told, the Governor issued sixty-four line item vetoes, which were then considered and overridden by the Maine House of Representatives and Senate in votes that took place on June 18th & 19th.[11]  See 1 Legis. Rec. H-934 – H-956 (1st Reg. Sess. 2015); 1 Legis. Rec. S-1191 – S-1225 (1st Reg. Sess. 2015).  On June 29, 2015, the Governor issued a general veto on the budget bill.  See 1 Legis. Rec. S-1331 – S-1332 (1st Reg. Sess. 2015) (H.C. 322); see generally Opinion of the Justices, 673 A.2d 1291 (Me.

---

[10]  See Opinion of the Justices, 123 A.3d 494, 501 (Me. 2015).  The Court takes judicial notice of relevant facts contained in this Law Court decision regarding the first session of the 127th Legislature.  As this decision reflects, there were multiple significant disputes between the Maine Legislature and the Governor as the first session of the 127th Legislature headed towards adjournment.

[11]  None of these line item vetoes were specifically directed as stripping the funding for GWH.  See 1 Legis. Rec. H-934 – H-956 (1st Reg. Sess. 2015); 1 Legis. Rec. S-1191 – S-1225 (1st Reg. Sess. 2015); see also Second Am. Compl. ¶ 14 (noting that Eves is not challenging the Governor's decision to veto or not veto any budget item).

1996) (describing the operation of the line item veto and the general veto powers the Governor has under the Maine Constitution).   Both houses of the Maine Legislature overrode this veto on June 30, 2015, thereby enacting the biennial budget that included the discretionary funding for GWH.

On October 15, 2015, the GWH Board Chair testified before the Maine Legislature's Government Oversight Committee. He testified that (1) Speaker Eves was selected to be GWH's next President because he was the most qualified applicant and (2) Speaker Eves would be its President today except for Governor LePage's threats to withhold $1,060,000 in budgeted state funding unless Speaker Eves was fired.[12]

## III.    DISCUSSION

The factual allegations laid out above clearly display a "war of words" between the head of Maine's executive branch and a leader of Maine's legislative branch.   Such battles are an inevitable and intended part of a government built on the separation of powers.   As the First Circuit explained in another recent case, "Governors and administrations [as well as legislators] are ultimately accountable to the electorate through the political process, which is the mechanism to test disagreements."   Newton v. LePage, 700 F.3d 595, 604 (1st Cir. 2012).   As the extensive analysis that follows shows, the federal courts serve as a poor substitute mechanism for resolving such disagreements.   In fact, many of the doctrines discussed herein were developed to avoid the use of the judicial branch to resolve political disputes that are rightly reserved for the electorate.

---

[12] Plaintiff includes this particular testimony in his Complaint.  (See Second Am. Compl. ¶ 115.)  Plaintiff additionally attached to his Response a 29-page "Information Brief" by the Maine Office of Program Evaluation & Government Accountability (ECF No. 16) and the related Government Committee Oversight Addendum (ECF No. 16-1), which contains the results of a legislative branch investigation into many of the same factual allegations contained in the Complaint.  The Court declines any invitation to take judicial notice of the facts contained in these documents.  See Alharbi v. Beck, 62 F. Supp. 3d 202, 209 (D. Mass. 2014) (declining to take judicial notice of facts contained in a legislative report of the House Homeland Security Committee regarding the Boston Marathon Bombings).

In his recently filed Second Amended Complaint, Plaintiff makes clear that his pending claims are based on Defendant's various statements and "threats" that Plaintiff claims brought about the termination of his private employment:

> Eves is not challenging any action by LePage regarding (a) proposing, modifying, supporting, or not supporting any item in the state budget or proposed budget; (b) signing or vetoing the state budget; or (c) vetoing any bill. Rather, Eves is only challenging the threats and adverse actions by LePage regarding his exercise of the executive power to decline to "expend and disburse" discretionary funds that were authorized but not required to be expended by the enacted budget or were expected to be included in a budget about to be enacted.

(Second Am. Compl. ¶ 14.)  Thus, although the factual allegations in this case coincide with important dates on Maine's legislative calendar, this case is not intended to challenge any legislative action.  To be clear, the case is also not a challenge to any actual executive action, because LePage did not have any power to "expend and disburse discretionary funds" until the appropriation process was completed, which did not occur until June 30, 2015.

Via the pending Motion to Dismiss, Defendant presents multiple arguments as to why his alleged expressions regarding Plaintiff and his hiring by GWH cannot serve as a basis for any of the claims being pressed in this case.  First, Defendant invokes the doctrine of absolute immunity arguing that this doctrine bars all of Plaintiff's claims under 42 U.S.C. § 1983 (Counts I-IV).  Defendant then alternatively asserts that he is shielded by qualified immunity under the government speech doctrine.  With respect to the individual theories of recovery under § 1983, Defendant further argues that Count I, Plaintiff's claim alleging violation of his political affiliation rights, is also barred because Plaintiff, as President of GWH, was a "policymaker" who is not protected from political affiliation discrimination.  Defendant argues that Counts II (violation of right of free speech) and III (violation of right of association) are not allowed because Eves only alleges discrimination based on expressions made in his official capacity as Speaker, along with

the concomitant associations that gave further voice to those expressions. Defendant contends that he is immune from Count IV's allegations of a Fourteenth Amendment Due Process Clause violation because Plaintiff did not have a protected property interest in his employment with GWH and, in any event, Defendant's alleged acts did not violate any clearly established right of Eves, whether a property interest in his employment contract or a liberty right to the pursuit of his profession. Finally, Defendant argues that he has statutory immunity from Plaintiff's claim under the Maine Tort Claims Act (Count V) because the Act provides immunity for discretionary acts.

       The Court considers each of these arguments in turn.

### A.  Claims Under 42 U.S.C. § 1983 (Counts I-IV)

       Section 1983 provides a cause of action when an individual, acting under color of state law, deprives a person of constitutional rights. See 42 U.S.C. § 1983. In this case, Plaintiff pleads violations of multiple constitutional rights in four separate counts. Count I of Plaintiff's Second Amended Complaint alleges that LePage "violated Eves' federally protected First and Fourteenth Amendment right of freedom of political affiliation." (Second Am. Compl. ¶ 141.) Count II of Plaintiff's Second Amended Complaint alleges that LePage "violated Eves' federally protected First and Fourteenth Amendment right of free speech." (Second Am. Compl. ¶ 143.) Count III of Plaintiff's Second Amended Complaint alleges that LePage "violated Eves' federally protected First and Fourteenth Amendment right of freedom of association." (Second Am. Compl. ¶ 145.) Count IV of Plaintiff's Second Amended Complaint alleges that LePage "violated Eves' federally protected 14th Amendment right to procedural due process regarding (1) his property right in his employment contract with GWH and (2) his liberty and property interests in being free from

unreasonable government interference with his private employment."   (Second Am. Compl. ¶ 149.)

LePage argues in the Motion to Dismiss that this Court should apply absolute legislative immunity or qualified immunity to dismiss all of Eves' § 1983 claims.  The First Circuit has recognized that immunity "can be raised and evaluated on a motion to dismiss" because of "'the importance of resolving immunity questions at the earliest possible stage in litigation.'"  Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011) (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam) and additionally citing Siegert v. Gilley, 500 U.S. 226, 232-33 (1991)).  After all, the Supreme Court has stated that even "[q]ualified immunity is 'an immunity from suit rather than a mere defense to liability.'"  Pearson v. Callahan, 555 U.S. 223, 237 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).

### 1.  Absolute Immunity (Counts I-IV)

"Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'"   Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998) (quoting Tenney v. Brandhove, 341 U.S. 367, 376 (1951)).  "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."  Id.  The First Circuit has held that "a governor who signs into law or vetoes legislation passed by the legislature is also entitled to absolute immunity for that act."  Torres Rivera v. Calderon Serra, 412 F.3d 205, 213 (1st Cir. 2005).  To assess whether absolute immunity applies, the Court must consider whether the actions were "part and parcel of the legislative process."  National Ass'n of Social Workers v. Harwood, 69 F.3d 622, 631 (1st Cir. 1995).  In conducting this inquiry, Defendant's actions must be "stripped of all consideration of intent and motive."  Bogan, 523 U.S. at 55.

Other courts have certainly recognized that legislative immunity may attach to "discussions held and alliances struck regarding a legislative matter in anticipation of a formal vote." Almonte v. City of Long Beach, 478 F.3d 100, 107 (2d Cir. 2007). However, the First Circuit has suggested that "activities that are more political than legislative," such as the dissemination of "press releases to the public," do not qualify for absolute immunity. Harwood, 69 F.3d at 630; see also Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 29 (1st Cir. 1996). More specifically, "there is no immunity for political activities, including a wide range of legitimate errands performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called news letters to constituents, news releases, and speeches delivered outside the Congress." Youngblood v. DeWeese, 352 F.3d 836, 840 (3d Cir. 2003), as amended (Feb. 11, 2004) (internal citations and quotations omitted).

To the extent that courts have found the scope of absolute legislative immunity to be "essentially coterminous" with the immunity accorded members of Congress under the Speech or Debate Clause of the United States Constitution, Harwood, 69 F.3d at 629 (citing Supreme Court of Va., 446 U.S. at 732–33), it is worth noting that the Supreme Court has long acknowledged the limits of the protection accorded by the Speech or Debate Clause:

> [The Speech or Debate Clause] has not been extended beyond the legislative sphere. . . . Members of Congress are constantly in touch with the Executive Branch of the Government and with administrative agencies—they may cajole, and exhort with respect to the administration of a federal statute—but such conduct, though generally done, is not protected legislative activity. . . .
>
> Legislative acts are not all-encompassing. The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House. As the Court of Appeals put it, the courts have extended the privilege to matters beyond pure speech or debate

in either House, but 'only when necessary to prevent indirect impairment of such deliberations.' United States v. Doe, 455 F.2d, at 760.

Gravel v. United States, 408 U.S. 606, 624-25 (1972).  Applying Gravel, the First Circuit has explained:

> While the core protection conferred by the Clause concerns speech or debate by a member of Congress on the floor of either the Senate or the House", [Harwood, 69 F.3d at 630] (citing Gravel, 408 U.S. at 625), "the penumbra of the Clause sprawls more broadly." Id.  For example, the Clause covers voting; id. (citing Kilbourn v. Thompson, 103 U.S. 168, 204 (1880)); "conduct at legislative hearings," but not "private publication by a Senator on his own behalf of documents submitted at a hearing . . . ." Colon Berrios, 716 F.2d at 90 (citing Gravel, 408 U.S. at 624–27); "members . . . and their staffs" for preparation of "an allegedly defamatory report"; id.; and members in "voting for its publication," but not "general public dissemination [of the report] by legislative functionaries." Id. (citing Doe, 412 U.S. at 313–14). The Clause covers "a committee hearing or report designed to inform the [legislative] membership," but not an individual "Senator's publication of press releases or news letters," id. (citing Hutchinson v. Proxmire, 443 U.S. 111, 123–33 (1979)), nor individual "political" activities, such as are involved in "legitimate 'errands' performed for constituents, the making of appointments with Government agencies, [and] assistance in securing Government contracts." Harwood, 69 F.3d at 631 (alteration in original) (quoting Brewster, 408 U.S. at 512) (internal quotation marks omitted).

Romero-Barcelo, 75 F.3d at 29 (holding that absolute legislative immunity applied to § 1983 claims that relied on actions taken as part of a legislative committee's investigation and hearing, including the telecasting of the hearing).

Defendant argues that the determination of whether LePage's alleged statements were made as part of the legislative budget process should be dictated by the timing of when these statements were made relative to that process.  Since all of LePage's allegedly retaliatory conduct related to threats to withhold funds expected to be designated for GWH under a new budget, and since the conduct occurred prior to the enactment of that budget, then, according to LePage, that conduct must be legislative.  (See Def.'s Mot. at 7.)

However, Defendant's proposed analysis does not give adequate weight to the nature of the alleged statements.  See Romero-Barcelo, 75 F.3d at 29 ("It is the nature of the particular act

18

. . . which governs whether immunity attaches").  The statements did not concern LePage's views on the contents of the proposed budget legislation or his intentions regarding whether to sign or veto that budget.  Instead, the facts, as construed for the purpose of this Motion, indicate that the action LePage was threatening and preparing to take was an executive one: the impoundment, once the budget was enacted, of approximately $1 million of funds appropriated for GWH.  While LePage could not have followed through with his threat until the budget was enacted, his alleged statements presupposed that a budget containing funds for GWH would eventually be enacted and concerned his intentions as to how he would exercise his executive discretion to disburse those funds.  The timing of LePage's alleged acts are consistent with the scope of legislative activities for absolute immunity purposes, but the nature and substance of those acts are not.

Defendant's argument concerning the timing of LePage's alleged acts depends upon a broad definition of legislative action, under which any statement or action tied to an appropriation is deemed legislative action so long as the budget has not yet been enacted.[13]  However, simply stated, this is not the state of the law on absolute immunity; certainly, the First Circuit has not embraced a delineation of "the legislative sphere" that would encompass any and all statements or threats regarding a governor's intention to withhold discretionary funding merely because those statements and threats were made before the funding in question had been finally enacted.

Defendant has disputed that his alleged threats concerned the discretionary exercise of an executive act.  Citing a decision of the Third Circuit, LePage asserts that the decision to withhold

---

[13] In fact, there are clearly legislative actions that Defendant could have taken during the relevant timeframe.  However, Plaintiff does not allege that Defendant actually took any such legislative actions.  By way of example, Defendant did not issue a line item veto of GWH funding or apparently direct any of his complaints on this issue to the Maine Legislature or individual legislators.  While he did issue a general veto of the budget on June 29, 2015, Plaintiff had already been terminated by that date, and thus the general veto clearly played no role in Plaintiff's loss of his position as GWH President.

funds is itself a legislative act.  See Youngblood v. DeWeese, 352 F.3d 836 (3d Cir. 2003).[14]  In Youngblood, a Pennsylvania state legislator sued the leadership of the Pennsylvania House of Representatives, alleging that her rights of equal protection had been violated when the House leaders, acting pursuant to discretion accorded them in a legislative appropriation, allocated insufficient funds for her district office.  Id. at 838.  According to the court, the legislature "delegated the legislative authority to determine an individual Representative's funding to the House of Representatives' party leaders," which it likened to "delegating to a legislative committee completing the allocation process" as an action protected by legislative immunity.  Id. at 841.

Defendant's argument that the logic of Youngblood should extend to a legislative delegation of funding discretion to the executive is not without persuasive power.  As Defendant argues, it seems plausible that, just as the allocations by party leaders were deemed a continuation of the legislative process in Youngblood, the Governor's decision of whether or not to release funds to GWH was also a part of the legislative process initiated by the Legislature's grant of discretion to the Governor in the budget.  However, this Court would nonetheless have to extend the reasoning in Youngblood to conclude that the allegations in the record here constituted legislative activities, and there is reason to believe, based on the First Circuit case law, that the First Circuit is more circumspect about extending legislative immunity to protect discretionary decision-making by the executive while the budget is implemented.

---

[14] Defendant also cites to Timmon v. Leeman, No. 07-CV-999, 2008 WL 2774678 (W.D. Mich. Mar. 13, 2008).  In Timmon, the plaintiff's claim against members of a city council who voted against part of her request for grant funding was barred by absolute immunity.  Id. at *7.  Unlike the case at hand, Timmon involved a local legislative body making decisions about the use of funds not yet earmarked for any particular recipient.  Id. at *2 (describing the city council's stated decision that it "would not be funding any cash grants").  Even if this Court were to accept that the logic of Timmon could extend to the exercise of discretion by a governor in withholding funds already included in the legislature's enacted budget, the Court is not convinced that it should so extend this single decision.

As the First Circuit explained in <u>Acevedo-Garcia v. Vera-Monroig</u>, "If [a] decision stems from specific facts relating to particular individuals or situations, the act is administrative. . . . [I]f it singles out specifiable individuals and affects them differently from others, it is administrative." 204 F.3d 1, 9 (1st Cir. 2000) (internal quotation omitted); <u>see also</u> <u>Torres Rivera</u>, 412 F.3d at 214 (contrasting a governor's actions to implement legislation, including through discretionary hiring and firing decisions, from his legislative action in signing the underlying law). As alleged here, LePage allegedly acted based upon facts specific to Eves and adopted a policy regarding the discretionary funding of GWH that was entirely contingent upon Eves personally. Under the reasoning found in <u>Acevedo-Garcia</u> and <u>Torres Rivera</u>, such acts are categorized as discretionary administrative acts, not legislative acts simply by a statutory delegation of authority.

Additionally, in the Court's assessment, the Third Circuit in <u>Youngblood</u> was concerned that a denial of absolute legislative immunity would "enable the judicial branch to scrutinize the manner in which the General Assembly allocates internal funds." <u>Id.</u> at 842. Thus, a natural limiting principle of the <u>Youngblood</u> holding is that the allocation decisions made by party leadership were protected not because they were legislatively endowed exercises of discretion, but because they were exercises of discretion that concerned the internal affairs and operations of the legislature itself. To extend the discretionary funding principle to cases involving government officials in the executive branch would go far beyond the immediate concern of protecting the "independence of the legislative branch," <u>id.</u>, and in this particular case, may indeed have the opposite effect.[15]

---

[15] In the unique context of this case, a governor, the head of the Maine's executive branch, seeks to shield himself with absolute legislative immunity for a claim brought by a legislator. The result that Defendant urges, that absolute legislative immunity can block a claim by a legislator alleging retaliation based on his party affiliation and the positions he took during the course of legislative debate, seems to the Court to change the effect of the Speech or Debate Clause from a shield to a sword. The Court finds no support in the First Circuit case law for such an effect.

Ultimately, Defendant asks this Court to apply absolute immunity to a unique set of facts that does not fall within the scope of legislative acts previously recognized by the First Circuit. While Defendant's argument is grounded in the intuitive appeal of associating all funding-related speech during the pendency of budget negotiations with the legislative process, this argument extends the concept of legislative immunity beyond the narrower parameters discussed in Gravel, Romero-Barcelo, Acevedo-Garcia, Torres Rivera, and arguably even Youngblood.  Based on the record before the Court and the existing case law, a threat to withhold a discretionary appropriation that is expected to be enacted, but has not yet been enacted, is best characterized as an executive act of implementation that falls outside of the protected sphere of legislative activity.

Therefore, the Court declines Defendant's invitation to dismiss Counts I-IV as barred by absolute legislative immunity.


### 2.  Qualified Immunity

The Court next considers each of the qualified immunity arguments advanced by Defendant.  "The actions by the executive officials (including the governor) taken to *implement* legislation are not shielded by legislative immunity. . . . [T]hese implementation actions (as opposed to the governor's signing the law) should be evaluated under the qualified immunity doctrine, rather than under legislative immunity."  Torres Rivera, 412 F.3d at 214 (citing Scheuer v. Rhodes, 416 U.S. 232, 247-48 (1974)).  "Qualified immunity is a doctrine that shields government officials performing discretionary functions from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Estate of Bennett v. Wainwright, 548 F.3d 155, 167 (1st Cir. 2008) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  It "gives government

officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

"Determining whether a defendant is entitled to qualified immunity involves two questions: (1) whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right, and (2) whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 72 (1st Cir. 2016) (internal citations and quotations omitted).  However, the Court may engage these questions in any order.  See Pearson v. Callahan, 555 U.S. 223, 236 (2009).  Since Pearson, it is common for courts to consider the "clearly established" inquiry first recognizing that it is frequently determinative of the qualified immunity question.

As the Supreme Court recently explained,

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.  We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.

Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citations omitted). "The 'clearly established' prong has two aspects: (1) 'the clarity of the law at the time of the alleged civil rights violation,' and (2) whether, given the facts of the particular case, 'a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights.'" Barton v. Clancy, 632 F.3d 9, 22 (1st Cir. 2011) (quoting Pearson, 555 U.S. at 269).

Given the multiple theories of recovery advanced by Eves in connection with his § 1983 claims, the Court considers each of the following rights to determine if any were clearly established at the time in question such that the facts as alleged make out a violation that is "beyond debate":

(1) his First Amendment right of political affiliation; (2) his First Amendment right of free speech and freedom of association; and (3) his Fourteenth Amendment rights to procedural due process. However, before examining whether LePage might be entitled to qualified immunity on the arguments specific to each of these distinct theories, the Court first addresses an argument that would provide LePage with immunity for all of his statements; namely, that all of LePage's comments are protected government speech.

### a. Government Speech (Counts I-IV)

All of Eves' 42 U.S.C. § 1983 claims are based on various statements made by LePage, acting as the Governor.  Courts have taken a "cautious approach to limiting government speech." Goldstein v. Galvin, 719 F.3d 16, 30 (1st Cir. 2013); see also, e.g., Walker v. Texas Div., Sons of Confederate Veterans, Inc., 135 S. Ct. 2239, 2245 (2015) ("[I]t is the democratic electoral process that first and foremost provides a check on government speech.")  As the First Circuit explained in Goldstein, "Not only do public officials have free speech rights, but they also have an obligation to speak out about matters of public concern." 719 F.3d at 30.  Given this concern, the First Circuit held in Goldstein that "a government official's issuance of a true statement . . . about a matter of public concern" cannot form the basis for a § 1983 claim.  Id. at 31.  However, the First Circuit has also recognized that the protection for government speech does not extend to speech that is "threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow."  Id. (citing and quoting Baltimore Sun Co. v. Ehrlich, 437 F.3d 410, 417 (4th Cir. 2006)).

At the motion to dismiss stage, the Court must accept the well-pled allegations of the Complaint.  Plaintiff's well-pled allegations set forth statements by Defendant that threatened GWH with the loss of discretionary funding and further allege that Defendant knew this funding

was vital to GWH's continuing operations at the time he made the alleged statements.  The Court cannot characterize all of these alleged statements by LePage as being akin to accurately referencing the plaintiff's name in a public press release, like the statement at issue in <u>Goldstein</u>. 719 F.3d at 30.  Nonetheless, for a statement to fall outside of government speech protection, the alleged threats must communicate imminent punishment, sanction, or adverse regulatory action.

Layering the filter of qualified immunity over this threat exception to the government speech doctrine requires that the available precedent clearly establish for any reasonable official in LePage's position that one or more of the alleged statements amount to speech that conveys imminent punishment such that it falls outside of protected government speech.  To the extent that there is a lack of clarity in the case law on this point, LePage is entitled to the benefit that comes from the dual shields of qualified immunity and government speech.

With respect to the "clearly established" qualified immunity inquiry, the Court cannot conclude that available legal precedent would have made it clear to any reasonable official that any of LePage's statements fell outside of the scope of protected government speech.  Plaintiff urges the Court to characterize Defendant's allegedly "concrete actions against Eves" as analogous to statements made by the defendant in <u>Blankenship v. Manchin</u>, 471 F.3d 523 (4th Cir. 2006). (Pl.'s Response at 11.)  In <u>Blankenship</u>, the sitting Governor of West Virginia allegedly threatened imminent adverse regulatory action against a coal company in retaliation for the political speech of the president of that company.  <u>Id.</u> at 525-26.  Here, in contrast, Defendant threatened to immediately withhold discretionary funding for GWH, whether because of Eves' political affiliation, in retaliation for Eves' expressions and associations that reflected opposition to charter schools, or out of personal animus towards Eves.[16]  Viewed in terms of the consequence that

---

[16] In the Second Amended Complaint, Plaintiff makes allegations that could support each of these as the reason for LePage's statements that he would withhold funding for GWH.  (<u>Compare</u> Second Am. Compl. ¶ 4 (describing

Defendant allegedly threatened to impose on GWH, his statements do not qualify as an imminent threat to bring governmental power to bear on a private individual or entity.  Rather, LePage's statements can be viewed as an attempt to ensure that a public expenditure would be utilized to achieve a policy goal related to charter schools for at-risk youth.

Plaintiff has not identified any legal authority that would have made clear to an official in Defendant's position that a threat to withhold discretionary funding equates to a threat of punishment, sanction, or adverse regulatory action.  Generally, courts seeking to apply the threat exception to government speech have identified measures that directly impose a restriction or encumbrance on the plaintiff or the plaintiff's employer.  See id. at 526-27 (alleging that the defendant subjected the plaintiff to "even more scrutiny," including the use of state government resources to conduct investigations of the plaintiff's company); Helvey v. City of Maplewood, 154 F.3d 841, 843 (8th Cir. 1998) (alleging that one of the defendants, the city manager, threatened to shut down the plaintiff's employer unless the plaintiff was fired); see also Stidham v. Tex. Comm'n on Private Sec., 418 F.3d 486, 491-92 (5th Cir. 2005) (alleging in a suit asserting a violation of due process rights that one of the defendants, a state investigator, threatened the plaintiff's clients with prosecution if they continued to do business with the plaintiff).  The threat allegedly made by Defendant here is different in both magnitude and kind.  Quite simply, the Court cannot say that it is "beyond debate" that a governor is not protected by qualified immunity in making the statements that LePage allegedly made.  Stanton v. Sims, 134 S. Ct. 3, 5 (2013) (quoting al–Kidd, 563 U.S. at ——, 131 S. Ct. at 2083).

---

LePage's threats as "part of his all-out partisan war on Democrats and their top leader [Eves]") with Second Am. Compl. ¶ 101 (quoting LePage as stating in his opposition to GWH's hiring of Eves that "Eves has been a longtime opponent of public charter schools" and is backed by "union bosses") and Second Am. Compl. ¶ 114 (quoting LePage as stating that Eves' "heart's not into doing the right thing for Maine people").

Turning to the primary question of whether the Governor's statements fall outside government speech, the Court is not convinced that the alleged threats constitute a communication intimating imminent punishment or sanction. Plaintiff urges this Court to conclude that an act by Defendant to withhold discretionary funds from GWH would have amounted to a form of punishment for employing Plaintiff as its President. However, Plaintiff has not presented, nor has the Court found, any legal authority that concludes that impoundment of discretionary funds is equivalent to more traditional punishments that may be levied against an entity such as a fine or the loss of an operating license. In the Court's view, it would be a significant expansion of the threat exception to say that a government official's decision to withhold discretionary funds, based on the official's disapproval of the individual managing the prospective funding recipient, must be seen as a form of punishment such that a threat to do so is sufficient to state a claim for a violation of an individual's constitutional rights.

Plaintiff also has suggested that the alleged threats were more than a threat to withhold discretionary funding, and were, in effect, a threat to cause the closure of GWH and/or MeANS. To the extent that Plaintiff contends that this consequence is akin to the threatened regulatory investigations in Blankenship, the threatened business closure in Helvey, or the threatened prosecutions in Stidham, the comparison is inapt. Quite simply, the closure of GWH under these circumstances would not be the result of a government sanction or punishment; rather, it would be the fallout from the loss of discretionary government funding and the inability of GWH to find an alternative funding source. To borrow from the jurisprudence involving government subsidized speech, GWH's alleged dependency upon continuing government funding is not "of [the government's] own creation," and GWH's funding deficiency is thus not an "obstacle" that the

state is obliged to remove, such that failing to do so would constitute a punishment of GWH. Regan v. Taxation with Representation of Washington, 461 U.S. 540, 549 (1983).[17]

In summary, with respect to qualified immunity and government speech, the Court finds Defendant is entitled to qualified immunity under both prongs of the required qualified immunity analysis. First, it was not sufficiently clear under the then-existing precedent that the statements allegedly made fall outside the protections for government speech. Rather, a reasonable official in LePage's shoes could have seen the alleged statements as protected government speech and believed that he was "instigat[ing] a public controversy about an unusual hiring decision that had larger policy implications." Barton v. Clancy, 632 F.3d 9, 30 (1st Cir. 2011). Second, the Court declines to find that the alleged statements made here fall within the threat exception to the government speech doctrine since there was no imminent punishment or sanction threatened for GWH or Eves. Rather, to find a constitutional violation on the facts alleged would significantly expand the set of expressions and the set of executive actions for which a governor could bear personal liability under 42 U.S.C. § 1983 to potentially include all discretionary funding decisions. While the Court concludes that the dual shields of the government speech doctrine and qualified immunity justify the dismissal of Counts I-IV, the Court proceeds to separately evaluate the additional arguments advanced by Defendant pertaining to each of the four counts to see if they provide any alternative bases for dismissal.

---

[17] Case law on the issue of government subsidies and First Amendment activities further illustrate the complexities of differentiating between permissible and impermissible application of discretion when allocating government funds. See Regan, 461 U.S. at 549 (describing the selection of particular entities or persons for the receipt of government largesse as generally "a matter of policy and discretion not open to judicial review" (internal quotation omitted)); National Endowment for the Arts v. Finley, 524 U.S. 569, 587-88 (1998) (describing government discretion to "selectively fund a program to encourage certain activities" so long as the government does not, through the provision of subsidies, "aim at the suppression of dangerous ideas" (internal quotation omitted)). Against the backdrop of these principles, it becomes even more difficult for Plaintiff to contend that the law clearly established that Defendant's statements would violate the constitutional rights of Plaintiff.

### b. Clearly Established Rights of Political Affiliation (Count I)

The Court next considers the first of two arguments made by Defendant in connection with Plaintiff's claims of retaliation by Defendant based on Plaintiff's exercise of his First Amendment rights. "[T]o prevail on a § 1983 claim of retaliation for First Amendment activity, a plaintiff must show: (1) that his conduct was constitutionally protected, and (2) that this conduct was a substantial factor or a motivating factor for the defendant's retaliatory decision." Rosaura Bldg. Corp. v. Municipality of Mayaguez, 778 F.3d 55, 66 (1st Cir. 2015); see also Sanchez v. Pereira–Castillo, 590 F.3d 31, 50–51 (1st Cir. 2009) (A "causal connection . . . can be established not only by some kind of personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury. . . . Put another way, an actor is responsible for those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties.") (citations, brackets, and quotation marks omitted). "[T]he pertinent question in a § 1983 retaliation case based on the First Amendment is whether the defendant's actions would deter a reasonably hardy individual from exercising his constitutional rights." Barton, 632 F.3d at 29 (internal quotation marks and citation omitted).

Invoking an exception to the general framework, Defendant argues that Eves was not protected from government interference with his employment on account of his political affiliation, because the position of President of GWH must be deemed a policymaker position, thereby making political affiliation an allowable consideration. See Rosenberg v. City of Everett, 328 F.3d 12, 17-18 (1st Cir. 2003). The First Circuit has generally endorsed a two-prong test for determining whether a *public* employee may be terminated on account of political affiliation without running afoul of the First Amendment. O'Connell v. Marrero-Recio, 724 F.3d 117, 126 (1st Cir. 2013). Under this test, the Court first looks at "whether "the discharging agency's functions entail

decision making on issues where there is room for political disagreement on goals or their implementation." Id. (internal quotations and citations omitted). Then, the Court determines "whether the particular responsibilities of the plaintiff's position resemble those of a policymaker, privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement for continued tenure." Id. (internal quotations and citations omitted).

As set forth above, this two-prong test would appear to have little applicability to the leader of GWH, a *private* organization that receives some amount of state funding for its charter school operation. Plaintiff correctly points out that Defendant's argument, if credited, might logically be extended to any private organization that receives state funding, and could potentially be used to force such organizations to change their leadership any time there is a change in the elected leadership of state government.

However, Defendants maintain that "the First Circuit has applied the policymaker exception to private organizations," citing Prisma Zona Exploratoria v. Calderon, 310 F.3d 1, 7-8 (1st Cir. 2002) and Ramirez v. Arlequin, 447 F.3d 19, 23 (1st Cir. 2006). (Def.'s Reply at 4.) Consistent with Defendant's argument, the First Circuit has described the holding of Prisma Zona as reflecting "that the government's policymaking interest could override the First Amendment protection against political discrimination, *even where the plaintiff was not a government employee*." Ramirez, 447 F.3d at 23 (emphasis in original). The Court acknowledges that the allegation that Defendant threatened to withhold discretionary funds from GWH, standing alone, is a matter of policy akin to the Puerto Rican administration's decision not to award the museum contract to the plaintiff in Prisma Zona. Nonetheless, Prisma Zona is factually distinguishable

from the allegations here, and applying the policymaker exception to the position of President of GWH would extend the exception beyond the scope supported by the current case law.

First, the plaintiff in Prisma Zona was a private entity created to be a contractual counterparty to a government-created public corporation.  In contrast, the plaintiff in this case is not GWH, the private organization seeking government support, but a particular employee of that organization who was allegedly targeted for termination of employment by a public official.  To the extent that Prisma Zona extended the policymaker exception in the First Circuit from certain government employees to a private entity, this extension was framed as including the "set of decisions related to the possible privatization (whether to do so and through whom) of the operation of a children's museum and directing to it millions of dollars of public monies" at issue in Prisma Zona.  310 F.3d at 7.  The court in Prisma Zona sought to insulate "policy choices of th[e] magnitude" of an institution's privatization and the allocation of substantial public funding to that institution from judicial "second-guessing."  See id.  That reasoning does not speak to the state's interest in dictating what individuals can (or cannot) be employed by a private employer.  Using the Ramirez court's characterization of Prisma Zona, the plaintiff in that case "sought a continuing relationship with the government that would hamstring the government's ability to change policy directions."  Ramirez, 447 F.3d at 24.  The record does not provide a basis for the Court to conclude that Eves, as an individual President of GWH, was similarly positioned.

Likewise, there are factual differences in the private entity at issue in Prisma Zona and GWH.  In the case at hand, GWH is described as a private non-profit organization with a long history of providing charitable services with a combination of private donations and government grants.[18]  By comparison, the plaintiff in Prisma Zona was a corporation that was specifically

---

[18] It may be the case that GWH's role as the operator of MeANS, a charter school instituted by express statutory authorization, creates a stronger nexus between governmental policymaking and a private organization than is

formed to carry out the construction and operation of a publicly funded children's museum.  See Prisma Zona, 310 F.3d at 3.  The nature and scope of operations of GWH, which, on this record, reach well beyond its role in the management and operations of MeANS, cast doubt both on whether GWH's "functions entail decision making on issues where there is room for political disagreement on goals or their implementation" and whether the position of GWH President has responsibilities such that "party affiliation is an . . . appropriate requirement for continued tenure." See Marrero-Recio, 724 F.3d at 126.

In effect, Defendant asks this Court to extend the holding in Prisma Zona from the protection of a government's funding choices to the protection of a public official's use of funding threats to cause the firing of an employee of a private entity that receives public funds to support certain of its operations.  The Court concludes that the particular responsibilities of GWH President do not resemble those of a public policymaker or some other office holder whose function is such that party affiliation is an equally appropriate requirement for continued tenure, and in particular that Prisma Zona does not provide an adequate basis for shielding a public official's actions to procure the termination of an individual's private employment.

Because no reasonable official in LePage's shoes could have concluded that the position of GWH President was a policymaker position for which political affiliation was an allowable basis for termination,[19] the policymaker exception does not bar Eves from pressing his theory that LePage's actions violated his political affiliation right.

---

ordinarily the case where the government provides a direct or indirect financial benefit to a private actor.  However, the record currently before the Court does not enable the Court to conclude that GWH is analogous to a "discharging agency" in the usual formulation of the policymaker exception.  See Marrero-Recio, 724 F.3d at 126.

[19] As alleged in the Complaint, LePage sought to prevent GWH from employing Eves in particular.  There is no allegation that they could not employ a Democrat (the Court notes that the previous President of GWH, Cummings, was a Democrat), nor is it alleged that LePage suggested that he would withhold funding if GWH hired another President who had previously taken positions against charter schools (which Cummings also allegedly did).  Thus, the Court recognizes that the evidence that LePage's actions were substantially motivated by Eves' political affiliation

### c.  Clearly Established Rights of Free Speech (Count II)

Alongside Plaintiff's other allegations regarding Defendant's actions, Plaintiff alleges that Defendant threatened to withhold funding from GWH because he considered Plaintiff to be a "longtime opponent of public charter schools."  (Second Am. Compl. ¶ 101.)   Retaliatory employment actions do not violate the First Amendment if the speech in question was made pursuant to the employee's official duties.  Defendant argues that Eves cannot point to any statements he made "as a private citizen" as compared to statements he made in his official role as a legislator.  The Complaint's only specific allegation regarding statements or votes by Eves that could indicate opposition to charter schools is a reference to "[n]ews releases by Eves that criticized certain aspects of charter schools and the Governor's proposed policies regarding charter schools."  (Id.)  The Complaint does not include any particular expressions by Plaintiff that could be connected to his life as a private citizen, or that relate to a form of expression squarely protected by the First Amendment.[20]  The Complaint does clearly allege, however, that LePage stated that Eves was an opponent of charter schools.

"The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  Garcetti v. Ceballos, 547 U.S. 410, 417 (2006) (citations omitted).  The Supreme Court has explained that this First Amendment protection "limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." Id. at 419.  However, in Garcetti, a case in which a prosecutor alleged retaliation for a

---

could be disputed.  However, the Court cannot resolve such factual disputes at this juncture, and assumes, for the purpose of this analysis, that LePage's actions were motivated by discrimination against Eves because he is a Democrat.

[20] For instance, the Complaint does not allege that Plaintiff cast legislative votes that embodied his expression on the subject of charter schools.  See Mihos v. Swift, 358 F.3d 91, 102-103 (1st Cir. 2004).

memorandum written as part of his job, the Supreme Court held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 421.

The Garcetti holding is designed to allow for constitutional protection of "participat[ion] in the public debate" and "contributions to the civic discourse." Id. at 422. Given these express allowances, it is difficult to see how Garcetti might apply to limit the official duty speech of a legislator, whose job description necessarily includes participation in public debates and civic discourse.[21]

To nonetheless analogize Garcetti to the facts alleged here, the Court would characterize Eves as an employee of the Maine Legislature and all of his alleged speech on charter schools as statements made pursuant to his legislative duties.[22] Then, to round out the analogy, the Court must view LePage as acting in the capacity of Eves' employer, disciplining him for his statements as a legislator.[23] Such an analogy is problematic in part because it disregards the separate branches of government in which Eves and LePage work and the fact that the Governor's powers, by design, do not include the power to discipline individual legislators. In light of the incompatibility between

---

[21] Finding little support for its view of Garcetti in First Circuit precedent, Defendant looks to other jurisdictions and asks this Court to follow the reasoning found in Hogan v. Twp. of Haddon, No. 042036, 2006 WL 3490353 (D.N.J. Dec. 1, 2006), Hartman v. Register, No. 06–cv–33, 2007 WL 915193 (S.D. Ohio Mar. 26, 2007), and Parks v. City of Horseshoe Bend, 480 F.3d 837, 840 n. 4 (8th Cir. 2007). (Def.'s Mot. at 18.) To the extent that these decisions indicate that elected officials have no First Amendment protection for speech made in the course of their official duties, the Court believes these cases, which are all from outside the First Circuit, conflict with Mihos v. Swift, 358 F.3d 91 (1st Cir. 2004).

[22] This characterization disregards the fact that Maine legislators, as citizen legislators, are not only permitted, but also expected to spend at least some portion of their time acting as private citizens, which frequently includes work for other employers.

[23] In fact, Defendant explicitly acknowledges that he was not Eves' employer in connection with another argument contained in his Motion to Dismiss. (Def.'s Mot. at 22.)

the rationale and holding of <u>Garcetti</u> and Defendant's proposed application of <u>Garcetti</u> to these facts, the Court doubts that the holdings of <u>Garcetti</u> regarding permissible government employee discipline have force when applied to the non-employment relationship between a governor and a state legislator.[24]

The bar for Plaintiff, however, is higher than merely alleging facts that may fall outside of the rational purview of <u>Garcetti</u>. Rather, it must have been clear to any reasonable government official in Defendant's position that LePage, by taking the actions alleged in the Complaint, would be impermissibly retaliating against Plaintiff's constitutionally protected expressions.

In addressing the question of whether applicable legal authorities clearly established that Eves' speech, made in his official capacity, was protected by the First Amendment, the Court finds most illuminating the reasoning contained in <u>Werkheiser v. Pocono Twp.</u>, 780 F.3d 172 (3d Cir. 2015), <i>cert. denied</i>, 135 S. Ct. 404 (Nov. 2, 2015).[25] In that case, the Third Circuit conducted a full survey of the cases applying <u>Garcetti</u> to employment retaliation against elected officials. Ultimately, the court declined to decide whether <u>Garcetti</u> was applicable to elected officials' speech or not. <u>See</u> <u>id.</u> at 177. However, acknowledging the mixed conclusions reached in other jurisdictions, it concluded that "the well-reasoned decisions on both sides render the law

---

[24] The Third Circuit in <u>Werkheiser v. Pocono Twp.</u>, 780 F.3d 172 (3d Cir. 2015), offers a principle for limiting the manner and consequences of retaliation by one elected official against another: "[E]lected officials who are retaliated against by their peers have limited recourse under the First Amendment when the actions taken against them do not interfere with their ability to perform <i>elected</i> duties." <u>Id.</u> at 183 (emphasis added). If this principle were applied to the instant case, it could be argued that Defendant did not interfere with Plaintiff's performance of his legislative duties because he merely opposed Plaintiff's employment in a separate and private position. Plaintiff could counter that, because Maine has a citizen legislature, preventing a legislator from maintaining private employment jeopardizes his or her ability to serve in public office. This Court need not further explore this issue, however, because it was not clearly established that Eves' official speech was entitled to First Amendment protection.

[25] The Court notes that the decision in <u>Werkheiser</u> was issued on March 3, 2015, just a few months prior to the alleged June 2015 retaliation alleged in this case. Given that timing and the fact that the First Circuit has not spoken on the precise question raised here, <u>Werkheiser</u> stands as a particularly timely summary of what might be deemed the clearly established First Amendment rights of elected officials in jurisdictions throughout the United States.

sufficiently unclear at the time of [the defendants'] actions so as to shield them from liability." Id. at 181. Likewise, here, it is not beyond debate that Eves' official legislative speech is exempt from Garcetti, and thus afforded First Amendment protections.[26] Given this uncertainty, the Court alternatively finds LePage is entitled to qualified immunity on Eves' Count II claim that LePage violated Eves' First Amendment rights by retaliating against Eves for his official legislative speech by interfering with his private employment.[27]

### d.  Clearly Established Rights of Procedural Due Process (Count IV)

The Court next considers whether LePage may be particularly entitled to qualified immunity on Eves' claim that his due process rights were violated. As the foundation for his procedural due process theory of recovery in Count IV, Eves asserts both that he had a property right in his employment contract with GWH and that he had a liberty and property right to be free from unreasonable government interference with his private employment. At the outset, the Court recognizes:

> The right to hold private employment and to pursue one's chosen profession free from unreasonable government interference is encapsulated in the liberty concept of the Due

---

[26] The Court notes that nothing in Garcetti would appear to overrule the First Circuit's earlier clear reiteration in Mihos v. Swift, 358 F.3d 91 (1st Cir. 2004), of its prior holdings that a public official's act of casting a vote as a member of a board, commission, or other public body is an expression that is entitled to First Amendment protection. Mihos, 358 F.3d at 109. To the extent that Defendant argues for an application of Garcetti that would override this principle, the Court rejects an interpretation of Garcetti that enables a governor to impose retaliatory action upon a legislator based on that legislator's official votes. However, as explained above, Plaintiff has not made any allegations that would enable this Court to conclude that LePage retaliated against Eves for expression relating to Eves' legislative votes.

[27] Eves does not describe in detail the factual allegations that he believes support his claim for retaliation based on his political associations. However, to the extent that Eves' associative rights are referenced in the Complaint, this cause of action relates to his right of expression, as such rights might be advanced through association with organizations such as the Maine Education Association. (Second Am. Compl. ¶ 10.) Indeed, this stands to reason, because "the right to associate evolves from the First Amendment's guarantees of speech, assembly, petition, and free exercise, [and] the scope of protection for association corresponds to the constitutional solicitude afforded to the mode of First Amendment expression in which a particular group seeks collectively to engage." Wine and Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 50 (1st Cir. 2005). The Court concludes that, to the extent Eves has pled a freedom of association claim, he has done so in connection with his associations to engage in the expressive activities more particularly described in the Complaint. Consequently, Count III fails for the same reasons that Plaintiff has failed to state a claim for relief under Count II.

Process Clause. See Greene v. McElroy, 360 U.S. 474, 492 (1959); Truax v. Raich, 239 U.S. 33, 38 (1915). Courts typically have held that this right is implicated only by government interference that is direct and unambiguous, as when a city official demands that a restaurant fire its bartender, see Helvey v. City of Maplewood, 154 F.3d 841, 843–44 (8th Cir. 1998), or a state agency explicitly threatens to prosecute a private company's clients if they continue to contract with the company, see Stidham v. Tex. Comm'n on Private Sec., 418 F.3d 486, 491–92 (5th Cir. 2005).

Mead v. Indep. Ass'n, 684 F.3d 226, 232 (1st Cir. 2012).

To the extent that Eves claims a violation of liberty and property interests in pursuing his profession, the Court notes that the mere loss of one position is insufficient to state such a claim. See, e.g., Kartseva v. Dep't of State, 37 F.3d 1524, 1529 (D.C. Cir. 1994) (explaining that a plaintiff who had done Russian translation for a government contractor had "merely lost one position in her profession" and could not state a claim for violation of her due process liberty interest in pursuing her profession). Therefore, the Court focuses its analysis on Eves' claimed property right in his contract with GWH.

The Complaint alleges that Eves' contract with GWH "had a two-year initial term" and "a for-cause termination provision and no conditions or contingencies regarding (a) any form of actions or approvals by the State or (b) the receipt of funds from the State." (Second Am. Compl. ¶ 68.) However, the contract between GWH and Eves is not part of the record,[28] and there is no evidence that LePage himself was aware of the precise terms of this contract. Under Maine law, an employee generally has a protected property interest in an employment contract where termination has a for-cause limitation. See, e.g., Burrell v. Bd. of Trustees for the Univ. of Maine Sys., 15 F. App'x 5, 6 (1st Cir. 2001) (citing Krennerich v. Inhabitants of Town of Bristol, 943 F. Supp. 1345, 1352 (D. Me. 1996)). Thus, with a "for cause" contract, Eves would appear to satisfy

---

[28] As a result, it is not clear whether Eves had actually commenced employment prior to his termination on June 24, 2015.

the "first step" for the due process violation he alleges.  Caesars Mass. Manag. Co. v. Crosby, 778

F.3d 327, 332 (1st Cir. 2015) ("The first step in seeking relief from a deprivation of property

without due process in violation of the Fifth and Fourteenth Amendments is a legally plausible

allegation of a 'protected property interest' recognized under state law.")

        As discussed above, however, all of Defendant's alleged conduct was government speech

that did not cross the line into statements threatening imminent punishment, sanction, or adverse

regulatory action.  See supra III.A.2.a.  Plaintiff cites Helvey v. City of Maplewood, 154 F.3d 841

(8th Cir. 1998), in support of its argument that a government official's demand that a private

employee be fired gives rise to a Fourteenth Amendment claim.  However, Plaintiff fails to note a

critical distinction.  In Helvey, the plaintiff, who had been fired from her job at a private business,

stated a due process claim because she alleged that "government officials, *through exercise of their*

*regulatory authority over an employer*, demand[ed] the discharge of an employee."  Id. at 844

(emphasis added).  Here, Defendant, who is alleged to have threatened to withhold discretionary

funds from GWH, is not alleged to have applied the kind of regulatory authority that, under the

"clearly established" standard, amounts to a threat of imminent sanction or punishment, as the

defendant in Helvey did when he allegedly threatened to "shut [the plaintiff's employer] down"

and to revoke its operating license unless the plaintiff was fired.  Id.

        In its analysis of what kind of conduct can implicate the due process right in order to state

a claim for the violation of a clearly established right, the First Circuit referenced the conduct at

issue in Helvey and "a state agency explicitly threaten[ing] to prosecute a private company's

clients if they continue to contract with the company."  Mead, 684 F.3d at 232.  Both of these

examples involve the threat of regulatory or legal action to intrusively apply the coercive power

of the state against private parties.  Understood this way, these examples critically differ from Defendant's alleged threats to merely withhold discretionary funds.

As this Court already concluded, Defendant is entitled to qualified immunity on Count IV on the basis of government speech protections to the same extent as he is so entitled on Counts I-III.  Framed slightly differently, in the terms used by the Mead court in the due process context, Plaintiff has not "adequately alleged that there was any unreasonable government interference with [his] private employment."  Id.  Consequently, the Court alternatively concludes that, during the time period in question and on the facts alleged, legal precedent did not clearly establish that Defendant's alleged conduct would violate a protected property interest of Plaintiff and, thus, the alleged retaliation did not violate Plaintiff's Fourteenth Amendment rights.[29]

### 3. Claims for Non-Monetary Relief

In opposing the present Motion to Dismiss, Plaintiff argues that a finding that Defendant is entitled to qualified immunity on the claims made in Counts I-IV would not bar the Plaintiff's claims "for declaratory and injunctive relief and attorney's fees" in connection with each of those

---

[29] In reaching this conclusion, the Court notes that this case shares an important factual similarity with the First Circuit's recent decision in Caesars Mass. Manag. Co. v. Crosby, 778 F.3d 327 (1st Cir. 2015).  In Caesars, the plaintiff, a casino operating company, brought due process claims under 42 U.S.C. § 1983 against the Massachusetts Gaming Commission and individual commissioners alleging it had lost a private contract with another company, Sterling Suffolk Racecourse ("SSR"), as a result of various actions taken by state actor defendants, including indicating to SSR that a casino license application would not be granted to SSR if it continued to do business with the plaintiff.  The First Circuit addressed "whether any property interest created by a private contract like the Caesars–SSR agreement is protected property as against non-party state actors."  Id. at 333.  The court ultimately concluded that because "Caesars cannot allege any protected property interest at stake, the procedural and substantive due process claims have no foundation and are correctly dismissed for failure to state a claim subject to relief."  Id. at 335.  While the casino license application at issue in Caesars may readily be seen as a greater gamble than securing approximately $1 million in discretionary funding from Maine's biennial state budget, the two scenarios share one key common element:  discretion that yields an absence of entitlement as a matter of state law.  See id.; see also Machete Prods., L.L.C. v. Page, 809 F.3d 281, 291 (5th Cir. 2015) (concluding "a property interest is not created merely because funds were granted generously in the past" in the context of analyzing a § 1983 claim).  This similarity further supports the Court's conclusion that allowing Plaintiff's claims in Count IV to proceed would contradict the First Circuit's stated rationales for defining the scope of qualified immunity.

Counts.  (Pl. Response (ECF No. 14-1) at 17.)  Contrary to Plaintiff's argument, these claims are moot, and no legal basis exists for this Court to grant the unusual equitable relief that Plaintiff seeks.

Plaintiff cites Anthony v. Sundlun, 952 F.2d 603 (1st Cir. 1991), for the proposition that a preliminary injunction was warranted in a "meritorious" case of political affiliation discrimination. Indeed, in that case, the court concurred in the district court's analysis that the plaintiffs were likely to succeed in their political discrimination suit and upheld a restraining order that effectively reinstated the plaintiffs to their government employment positions, pending the further litigation of their claims.  Id. at 606.  In this case, on the other hand, Plaintiff does not seek equitable relief in order to remain in, or to be reinstated to, his former position at GWH.[30]  Rather, Plaintiff asks for an injunction "ordering LePage to unequivocally and permanently withdraw his illegal threat to [GWH]; to cease using his authority to illegally retaliate against Eves or private organizations that are prospective employers or employers of Eves because of political affiliation or political speech or political activities; to cease using his authority over state funding to interfere with Eves' employment opportunities with private organization . . . ."  (Second Am. Compl. ¶ 154.)

Neither Sundlun nor any other case Plaintiff has cited provides support for injunctive relief of this nature.  Plaintiff has not alleged present conduct or threatened or imminent conduct by Defendant that relates to the injunction he seeks, such as a present threat against GWH, present illegal retaliation against Eves or Eves' employer or prospective employer, or a state funding threat to interfere with Eves' present employment opportunities.  As a matter of law, Plaintiff has not argued that, should this case be allowed to proceed, he could meet the four-factor test that must be applied in order for this Court to grant a permanent injunction against Defendant.  See eBay Inc.

---

[30] In fact, as Defendant has no power to appoint Plaintiff to that position, no such remedy is even theoretically possible in this case.

v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) ("According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."). On this record, the Court has no basis to conclude that Plaintiff could establish that he is entitled to the extraordinary relief requested.

The fundamental reason why Plaintiff's argument for equitable relief fails succinctly captures the underlying inadequacy of his claims in Counts I-IV. This Court is no more empowered to use an injunctive order to compel Defendant to conform his behavior to some preferred standard of decorum than it is to identify in Defendant's alleged conduct, partisan or coarse though Plaintiff may characterize it as being, a basis for a violation of Plaintiff's clearly established rights. Even a claim that a government official "acted out of personal hostility" in prompting a government investigation of a particular individual, which may give rise to a "perceive[d] . . . abuse of government power," may still not violate any clearly established constitutional right as required to state a claim under 42 U.S.C. § 1983. Snyder v. Gaudet, 756 F.3d 30, 36 (1st Cir. 2014) (applying qualified immunity to a claim that a member of city council who was fired by Plaintiff retaliated by having the Plaintiff investigated and fined for building code violations and stating that "the political process may provide a venue for correcting or deterring abuses"). As alleged in this case, Defendant prompted a private entity to terminate Plaintiff, a newly hired employee, in order to ensure continued governmental funding for that entity. While the Court appreciates that Plaintiff and, indeed, many citizens may perceive in these

allegations an abuse of power, the Court concludes that the allegations do not violate any of Plaintiff's clearly established rights as required to state a claim under 42 U.S.C. § 1983.

### B.   Count V:  Intentional Interference with Contract

In Count V, Eves raises a tort claim that is subject to the Maine Tort Claims Act (the "MTCA").  Defendant seeks dismissal of this claim, invoking various immunity provisions contained in 14 M.R.S.A. § 8111.  Notably, under the MTCA, "[f]or individual defendants, as opposed to governmental entities, immunity is the exception and not the rule."  See Hilderbrand v. Washington Cty. Comm'rs, 33 A.3d 425, 428 (Me. 2011) (citing Moore v. City of Lewiston, 596 A.2d 612, 614–15 (Me. 1991)).

Defendant argues that Count V is barred under the immunity for discretionary acts contained in 14 M.R.S.A. § 8111(1)(C), which, in relevant part, provides immunity for "[p]erforming or failing to perform any discretionary function or duty, whether or not the discretion is abused."  14 M.R.S.A. § 8111(1)(C).  As explained by the Law Court, discretionary immunity "is lost when the conduct so clearly exceeds the scope of an employee's authority that the employee cannot have been acting in his official capacity."   See Hilderbrand, 33 A.3d at 429 (citing Selby v. Cumberland Cty., 796 A.2d 678 (Me. 2002)).

The Governor is vested with "the supreme executive power of this State" by the Maine Constitution.  Me. Const. art. V, pt. 1, § 1.  In his role as the supreme executive, the Governor is required to "take care that the laws be faithfully executed." Me. Const. art. V, pt. 1, § 12.  It is precisely because of this broad authority that Plaintiff's attempt to analogize the Governor to the police officer at issue in MacKerron v. Madura, 474 A.2d 166 (Me. 1984), fails.  MacKerron involved a police officer who intentionally interfered with an attorney-client relationship, an act

that the Law Court later described as "egregious conduct [that] clearly exceeded, as a matter of law, the *scope* of any discretion he could have possessed in his official capacity as a police officer." Polley v. Atwell, 581 A.2d 410, 414 (Me. 1990) (emphasis in original).

Quite simply, the discretion afforded the Governor is significantly greater than the discretion afforded to a police officer.  In the Court's assessment, the scope of the Governor's discretion clearly encompasses advocating for his preferred charter school policy and ensuring that enacted legislation involving charter schools is followed.  Moreover, it is explicitly clear that the Governor retained discretion to expend and disburse funds for a school that was designated as "the Center of Excellence for At-risk Students" pursuant to 20-A M.R.S.A. § 15689-A(20).  Ultimately, the Governor's alleged threats were made in his official capacity, and the individuals hearing those threats believed that the Governor could exercise his executive discretion to impound amounts appropriated in the budget.  Therefore, even assuming his threats to withhold such funds from GWH amounted to an abuse of his discretion, the Court finds that the Governor is entitled to immunity under § 8111(1)(C).[31]

The Governor is entitled to discretionary function immunity under § 8111(1)(C). Therefore, Count V must be dismissed.

---

[31] With respect to Defendant's argument that Count V is subject to legislative act immunity found in 14 M.R.S.A. § 8111(1)(A), the Court does believe that if Count I were barred by the doctrine of absolute legislative immunity, Count V would similarly fail under the just-cited provision of the MTCA.  However, having already concluded that the allegations of this case fall outside absolute legislative immunity, the Court declines to find that 14 M.R.S.A. § 8111(1)(A) bars Count V.

## IV.    CONCLUSION

For the reasons just stated, the Court hereby GRANTS Defendant's Motion to Dismiss (ECF No. 9).

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 3rd day of May, 2016.